KANSAS JUDICIAL REVIEW; The Honorable Charles M. Hart; The Honorable Robb Rumsey, Plaintiffs–Appellees,

v.

Mike L. STOUT, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Jennifer L. Jones, in her official capacity as a Member of the Kansas Commission on Judicial Qualifications; Nancy Anstaett, in her official capacity as a Member of the Kansas Commission on Judicial Qualifications; Patrick Brazil, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Theodore B. Ice, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Christina Pannbacker, in her official capacity as a Member of the Kansas Commission on Judicial Qualifications; William B. Swearer, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Carolyn Tillotson, in her official capacity as a Member of the Kansas Commission on Judicial Qualifications; Robert Fleming, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Bruce Buchanan, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Mary Davidson Cohen, in her official capacity as a Member of the Kansas Commission on Judicial Qualifications; Robert A. Creighton, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; David J. King, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Lawrence E. Sheppard, in his official capacity as a Member of the Kansas Commission on Judicial Qualifications; Edward G. Collister, Jr., in his official capacity as Commission Examiner for the Kansas Commission on Judicial Qualifications; Stanton A. Hazlett, in his official capacity as Disciplinary Administrator; Frank D. Diehl, in his official capacity as Deputy Disciplinary Administrator; Alexander M. Walczak, in his official capacity as Deputy Disciplinary Administrator; Janith A. Davis, in her official capacity as Deputy Disciplinary Administrator; Gayle B. Larkin, in her official capacity as Admissions Attorney, Defendants–Appellants.

Association of Judicial Disciplinary Counsel; National Ad Hoc Advisory Committee on Judicial Campaign Conduct; Columbus Bar Association; Dade County Bar Association; King County Bar Association; Georgia Committee for Ethical Judicial Cam-

---

paigns; South Dakota's Special Committee on Judicial Election Campaign Intervention; Conocophillips, Emerson; General Electric Company; General Mills, Inc.; General Motors Corporation; Halliburton Company; JP Morgan Chase & Co.; Motorola, Inc; Pepsico; Phelps Dodge Corporation; Texas Instruments Incorporated; Time Warner Inc.; Wyeth; The Brennan Center for Justice at New York University Law School; Conference of Chief Justices, Amici Curiae.

No. 06–3290.

United States Court of Appeals, Tenth Circuit.

March 12, 2008.

James Bopp, Jr., Anita Young Woudenberg, Thomas J. Marzen, Bopp, Coleson & Bostrom, Terre Haute, IN, Richard J. Peckham, Andover, KS, for Plaintiffs–Appellees.

Stephen O. Phillips, Office of the Attorney General State of Kansas, Topeka, KS, George T. Patton, Jr., Marisol Sanchez, Bose McKinney & Evans LLP, Indianapolis, IN, for Defendants–Appellants.

Before LUCERO, EBEL, and HOLMES, Circuit Judges.

### CERTIFICATION OF QUESTION OF STATE LAW

CARLOS F. LUCERO, Circuit Judge.

Kansas Code of Judicial Conduct Canons 5A(3)(d)(i) and (ii) and 5C(2) ("Canons") prohibit candidates for state judicial office from making certain kinds of pledges and commitments, and from personally soliciting support for their campaigns. Plaintiffs–Appellees Kansas Judicial Review ("KJR"), the Honorable Charles M. Hart, and Robb Rumsey filed

proceedings in the United States District Court of Kansas, claiming that the Canons are unconstitutional both on their face and as applied because they infringe on First Amendment rights of political expression. On the basis that plaintiffs had standing, that their claims were ripe, and that they were likely to succeed on the merits, the district court granted the preliminary injunction shortly before the 2006 state election. The Kansas Commission on Judicial Qualifications (the "Commission") appeals the grant of the preliminary injunction preventing enforcement of these Canons.

Exercising jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), we hold that plaintiffs have standing to challenge the Canons and that their claims are ripe. Because there are important and unsettled questions of state law underlying plaintiffs' claims, we **CERTIFY** questions to the Kansas Supreme Court. Accordingly, we reserve judgment on the grant of preliminary injunction pending the decision of the state court on these issues, and we retain jurisdiction over any federal constitutional questions remaining thereafter. We **VACATE** the preliminary injunction with respect to the unchallenged portion of Canon 5C(2) regarding judicial candidates' solicitation of campaign contributions.

**I**

**A**

Kansas provides for popular election of some judges, holding partisan political contests for judicial office in 14 of its 31 judicial districts. The Kansas Supreme Court has adopted a Code of Judicial Conduct ("Code") regulating the behavior of judges and judicial candidates. *See* Kan. Sup.Ct. R. 601A. Three bodies are involved in the interpretation and enforcement of the Code: the Judicial Ethics Advisory Panel ("JEAP"), the Commission, and the Kansas Supreme Court.

JEAP was created by the Kansas Supreme Court to provide nonbinding ethical "guidance" to persons subject to the Code. *See* Kan. Sup.Ct. R. 650. The panel is comprised of three retired judges, one of whom is usually a retired state Supreme Court justice, and panel members are appointed by the Kansas Supreme Court. Judges and judicial candidates may request advisory opinions interpreting the Code from JEAP. *Id.* Although these advisory opinions are not binding on the Commission or the Kansas Supreme Court, the Commission must take into account a judge or candidate's reliance upon an advisory opinion in its investigation of an alleged violation of the Code. Kan. Sup.Ct. R. 650(f). According to Justice Robert Six, a former Commission member and a retired Kansas Supreme Court justice, judges in the state rely upon these opinions and consider them "authoritative."

The Commission, also established by the Kansas Supreme Court, is charged with investigating allegations against judges and candidates, and recommending disciplinary action when necessary. *See* Kan. Sup.Ct. R. 602–21. Its 14 members are appointed by the Supreme Court and consist of a mix of judges, lawyers, and non-lawyers. Anyone may submit a complaint regarding the conduct of a judge or candidate to the Commission, with the majority of complaints coming from the general public. Each complaint received by the Commission is assigned to a seven-member panel for investigation. If the investigatory panel finds probable cause of a violation of the Code, it refers the matter to a seven-member hearing panel for a trial-like proceeding. There is no direct appeal of the investigatory panel's decision.

Upon finding clear and convincing evidence of an ethics violation, the hearing panel may take several actions, ranging from an admonishment by the panel to a recommendation that the Kansas Supreme Court remove the judge from the bench. Although the hearing panel may rely on clearly established constitutional law, it may not consider novel constitutional arguments. Disciplinary recommendations made by the panel are automatically reviewed by the Kansas Supreme Court. Factual findings of the hearing panel are subject to substantial evidence review.

This case involves challenges to three Code clauses. Canon 5A(3)(d) provides that judicial candidates "shall not make pledges or promises of conduct in office other than the faithful and impartial performance of the duties of the office" ("Pledges Clause") or "make statements that commit or appear to commit the candidate with respect to cases, controversies or issues that are likely to come before the court" ("Commits Clause"). Canon 5C(2) provides that "a candidate shall not personally . . . solicit publicly stated support," although candidates may establish committees to solicit support and campaign contributions on their behalf ("Solicitation Clause"). These clauses apply to all judicial candidates. *See* Kan. Sup.Ct. R. 601A pmbl. (defining "candidate"); 601A (containing Canon 5).

**B**

In February 2006, plaintiff KJR mailed a questionnaire and explanatory cover letter to all declared judicial candidates in Sedgwick County, Kansas. Candidates were asked to answer the questionnaire, designed to elicit views on a variety of legal and political issues.[1] The cover let-

---

1. Candidates were presented with eight propositions, ranging from whether a recent Kansas Supreme Court case violated the separation of powers to their personal views on marriage and when life begins. Next to each proposition, they were asked to mark one of the following statements: Agree, Disagree,

ter asked that candidates answer the questionnaire, consistent with their ethical obligations under the Code. An option of declining to respond if candidates believed the Code prohibited answering was offered. KJR received seven responses, only one of which included substantive answers to the questionnaire. All other candidates marked the "Decline to Respond" option.[2]

JEAP has issued two opinions addressing candidate questionnaires.[3] In 2000, JEAP published advisory opinion JE 100, which states that a judicial candidate may not answer questionnaires sent by newspapers for the purpose of deciding whether to make an endorsement. The majority of the panel viewed the answering of such questionnaires as requests for public endorsement and concluded that a response would violate the Solicitation Clause. One panel member dissented and advanced the view that a candidate may answer such questionnaires but "must be ever mindful of the Canons of Judicial Conduct, particularly Canon 5." After JE 100 was published, the Commission attached a "Note" to the opinion, stating that it was not bound by JEAP advisory opinions and adopted the minority view.

In 2006, plaintiff Robb Rumsey, at the time a candidate for judicial office, asked JEAP whether he could respond to KJR's questionnaire. In advisory opinion JE 139, citing the Pledges and Commits Clauses, JEAP determined that because he was an announced candidate, Rumsey could not answer the questionnaire. Again, the Commission attached a "Note" to the advisory opinion, rejecting JEAP's approach.[4] Citing *Republican Party of Minnesota v. White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), the Commission adopted the principle that judicial candidates may publicly announce their views on legal and political issues.

Since adoption of the Canons, the Kansas Supreme Court has spoken to the Pledges Clause on one occasion, but has yet to address the other two clauses at issue. *In re Baker*, 218 Kan. 209, 542 P.2d 701 (1975), involved a candidate who was subjected to disciplinary proceedings after publicly pledging to be a "full-time judge" and eliminate court delay. *Id.* at 704. Rejecting the Commission's disciplinary recommendation, the court held that these statements relate to the faithful performance of official duties and did not violate the Pledges Clause.[5] *Id.* at 705.

### C

Plaintiff Charles M. Hart, a state district court judge in Butler County, seeks

---

Undecided, Decline to Respond, and Refuse to Respond.

2. The questionnaire included a footnote to the "Decline to Respond" option, which states: This response indicates that I would answer this question, but believe that I am or may be prohibited from doing so by [the Pledges and Commits Clauses]. This response also indicates that I would answer this question, but believe that, if I did so, then I will or may be required to recuse myself as judge in any proceeding concerning this answer on account of Kansas Canon 3E(1)....

3. KJR sought an advisory opinion from JEAP on whether judicial candidates could answer

its questionnaire consistent with the Canons. JEAP refused to issue an opinion because, under the Kansas Supreme Court Rules, only persons subject to the Code may request an advisory opinion. Kan. Sup.Ct. R. 650(b).

4. This note was added on August 2, 2006, after the district court had issued a preliminary injunction in the present case.

5. In 1975, the Pledges Clause was contained in Canon 7B(1)(c) and stated that a candidate for judicial office *"should* not make pledges or promise of conduct in office other than the faithful and impartial performance of the duties of the office." *Id.* at 703 (emphasis added).

to be a candidate for re-election in 2008. In order to qualify as a candidate, he requires a sufficient number of voters sign a nomination petition. In 2004, JEAP issued advisory opinion JE 117, declaring that a judicial candidate may not seek signatures for a nomination petition under the Solicitation Clause. Neither the Commission nor the Kansas Supreme Court has addressed JE 117 or the Solicitation Clause. Hart proposes to go door-to-door to collect these signatures, but will not do so because he fears discipline pursuant to the Solicitation Clause.

### D

On May 24, 2006, KJR, Rumsey, and Hart filed a complaint against the Commission in federal district court, seeking injunctive and declaratory relief, and a motion for preliminary injunction. They requested that enforcement of the Pledges, Commits, and Solicitation Clauses be enjoined as being unconstitutionally overbroad and vague, and chilling candidates' political speech, thereby restricting the free exchange of views between candidates and potential voters. Additionally, plaintiffs argued that the Clauses were unconstitutional as applied to them. In response, the Commission asserted that KJR lacked standing to sue, this preenforcement challenge was not ripe, and the clauses were constitutional. It also requested certification of a question of state law to the Kansas Supreme Court, namely whether the Pledges and Commits Clauses function as the kind of prohibition on announcements struck down by the United States Supreme Court in *White*, 536 U.S. 765, 122 S.Ct. 2528, 153 L.Ed.2d 694.

After a hearing, the district court granted a preliminary injunction as to the Pledges, Commits, and Solicitation Claus-

es, and denied the remaining requests.[6] The district court found that, despite not being subject to the Canons, KJR had standing to challenge them and that plaintiffs' claims were ripe for review. It also found that plaintiffs were likely to succeed on the merits of their claims that the Clauses were unconstitutional and that the other preliminary injunction factors weighed in their favor. The Commission filed a timely notice of appeal.

On October 6, 2006, the district court denied both of the Commission's motions, for a stay of the injunction pending appeal and for certification of a question of state law to the Kansas Supreme Court. On November 3, 2006, a panel of this court granted the Commission's motion for a stay with respect to the portion of the Solicitation Clause concerning a judicial candidate's personal solicitation of campaign contributions.

### II

 At the threshold, we must determine whether plaintiffs' claims are justiciable—that is, whether plaintiffs have standing to sue and whether their claims are ripe for judicial review. We review questions of justiciability de novo. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216 (10th Cir.2006) (standing); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1238 (10th Cir.2004) (ripeness).

 We must also decide if, as the Commission suggests, we should refrain from hearing this case under *Pullman* abstention. *See R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941). We review de novo whether the requirements for *Pullman* abstention have been met. *See Spoklie v. Montana,*

---

**6.** Plaintiffs also challenged Canon 3E, which requires recusal in cases where a judge's "impartiality might reasonably be questioned," but the district court denied a preliminary injunction with respect to that canon. Plaintiffs do not appeal that decision.

411 F.3d 1051, 1055 (9th Cir.2005); *see also Taylor v. Jaquez,* 126 F.3d 1294, 1296 (10th Cir.1997) (reviewing question of *Younger* abstention de novo).

### A

■ As for standing, under Article III of the Constitution our jurisdiction is limited to actual cases or controversies. *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). In order to establish that standing exists, KJR must show: (1) an injury in fact; (2) a causal connection between the injury and the challenged act; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

■ According to the Commission, KJR lacks an injury in fact because KJR is not directly subject to the Canons; the Canons do not limit KJR's speech and the organization cannot be disciplined under the Canons.[7] In the First Amendment context, however, a plaintiff need not be subject to a speech restriction in order to have standing to advance a challenge. First Amendment protections extend to both speakers and listeners, the latter having a right to receive information and ideas. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 756–57, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *U.S. West, Inc. v. FCC,* 182 F.3d 1224, 1232 (10th Cir.1999). Thus, provided there is a willing speaker, KJR has standing to challenge the Canons. *Va. State Bd. of Pharmacy,* 425 U.S. at 756, 96 S.Ct. 1817. Rumsey, who was subject to the Canons during his 2006 candidacy, claims to be a "willing speaker." He tells us that but for the limitations imposed by the Canons, he would have answered KJR's questionnaire.[8] Accordingly, KJR had standing to challenge the Canons at the time the action commenced.[9]

### B

■ As to ripeness, the Commission argues that KJR's claims are not prime for adjudication because there is no clear threat that the Canons will ever be enforced against the candidates involved in

---

**7.** Because both Hart and Rumsey were candidates subject to the Canons, they clearly demonstrated standing to bring suit, and the Commission does not contend otherwise.

**8.** The Commission points to recent cases involving challenges to similar judicial canons in which plaintiffs' claims were dismissed for lack of standing. *Pa. Family Inst., Inc. v. Black,* 489 F.3d 156 (3d Cir.2007); *Ind. Right to Life, Inc. v. Shepard,* 507 F.3d 545 (7th Cir.2007). In those cases, however, plaintiffs failed to show that there were any judicial candidates who would be willing to answer the questionnaire, and no candidates were parties. *See Pa. Family Inst.,* 489 F.3d at 166–69; *Ind. Right to Life, Inc.,* 507 F.3d at 549–50. By contrast, recipient standing exists when judicial candidates themselves are parties and attest to a willingness to answer the questionnaires. *See, e.g., Pa. Family Inst., Inc. v. Celluci,* No. 07–1707, 2007 WL 3010523, at *8 (E.D.Pa. Oct. 16, 2007).

**9.** Although neither the parties nor amici have raised the question of mootness, we are obligated to conduct "an independent de novo review to determine whether a case is moot before proceeding to the merits." *Prier v. Steed,* 456 F.3d 1209, 1212 (10th Cir.2006) (quotation omitted). Because Rumsey is no longer a candidate for office, and KJR has not alleged the existence of another candidate willing to answer the questionnaire, their claims are now moot. We conclude, however, that this case falls under the exception to the mootness doctrine for cases "capable of repetition, yet evading review." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (quotation omitted); *see also, e.g., FEC v. Wis. Right to Life, Inc.,* —— U.S. ——, 127 S.Ct. 2652, 2663, 168 L.Ed.2d 329 (2007); *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 301 n. 12, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Homans v. City of Albuquerque,* 366 F.3d 900, 903 n. 3 (10th Cir.2004).

the present case. In order for a claim to be justiciable under Article III, it must present a live controversy, ripe for determination, advanced in a "clean-cut and concrete form." *Renne v. Geary*, 501 U.S. 312, 322, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). Our ripeness inquiry "focuses not on whether the plaintiff was in fact harmed, but rather whether the harm asserted has matured sufficiently to warrant judicial intervention." *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir.2004) (quotation omitted). In short, "[r]ipeness doctrine addresses a *timing* question: *when* in time is it appropriate for a court to take up the asserted claim." *ACORN v. City of Tulsa*, 835 F.2d 735, 738 (10th Cir.1987) (quotation omitted).

 Generally, we apply a two-factor test to determine whether an issue is ripe. We evaluate "the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration." *Sierra Club v. Yeutter*, 911 F.2d 1405, 1415 (10th Cir.1990) (quotation omitted). Our ripeness analysis is "relaxed somewhat" in the context of a First Amendment facial challenge, however, because an unconstitutional law may chill free speech. *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir.1995) ("*Richardson*"). In such cases, we look at three factors to evaluate the ripeness of a claim: "(1) hardship to the parties by withholding review; (2) the chilling effect the challenged law may have on First Amendment liberties; and (3) fitness of the controversy for judicial review." *Id.* at 1499–1500.

*Richardson* proves highly informative to our resolution of the present question. In that case, New Mexico passed a statute preventing candidates for state office from using contributions raised in a federal election campaign. Richardson, at the time a United States Congressperson, brought a facial challenge against the statute, claiming that it infringed on his right to political expression and association. Because Richardson was not currently running for state office, New Mexico argued that his claims were not ripe. *Richardson*, 64 F.3d at 1502.

In holding that his claims were ripe, we emphasized the special concerns raised in the context of political speech. We acknowledged that, as a general matter, "First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss." *Id.* at 1500 (quotation omitted). In addition, we recognized that "[t]he principle that 'one does not have to await the consummation of threatened injury to obtain preventive relief' 'is particularly true in the election context.'" *Id.* at 1501 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) and *Renne*, 501 U.S. at 332, 111 S.Ct. 2331 (White, J., dissenting)).

Regarding the first ripeness factor, hardship to the parties, we concluded that Richardson had presented evidence indicating a "direct and immediate dilemma" for his campaign as a result of the statute. *Id.* at 1500 (quotation omitted). In response to the state's argument that there was no immediate threat of prosecution, we held that such a threat was not necessary to ripen the claim. *Id.* at 1502. Given that the government had "not affirmatively disavowed any intention of bringing a criminal prosecution against Congressman Richardson," and there was a reasonable likelihood that he may well have violated the statute, we found a credible risk of prosecution. *Id.* Regarding the second ripeness factor, we noted that the statute's vagueness likely increased its chilling effect on speech, and that "[i]t is generally accepted that the arguable vagueness of a statute greatly militates in favor of finding

an otherwise premature controversy to be ripe." *Id.* at 1503. Finally, we concluded that the purely legal nature of the questions presented weighed in favor of finding the case fit for review. *Id.*

▇▇▇▇ Turning to the present case, we must first consider the hardship to the parties were we to withhold judicial review. In evaluating this hardship, we ask whether the Canons create "a direct and immediate dilemma for the parties." *Id.* at 1500. The judicial candidates assert that they face such a dilemma, because they must choose not to speak, and thereby sacrifice their First Amendment rights, or do so and potentially run afoul of the judicial canons. They claim that both the plain language of the Canons and the interpretations of those Canons by JEAP create a chilling effect on candidate speech. In response, the Commission contends that the Canons do not prohibit relevant speech activities of the candidates, and thus the candidates cannot reasonably fear that they will be subject to Canonic discipline. Moreover, the Commission argues, there has been no actual threat of disciplinary action, as neither the Commission nor the Kansas Supreme Court have indicated that they will enforce the Canons in this case.

We assume for the purposes of our ripeness inquiry that the candidates' legal argument is correct, *see Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1098 (10th Cir.2006), and that the Canons do apply to the conduct in question. This assumption is not entirely unfounded. At least one body charged with interpreting the Canons, the JEAP, has read them to bar candidates from answering questionnaires or personally soliciting signatures.[10] In addition, plaintiffs presented evidence that they have altered their behavior in response to the Canons. At the time this action was initiated below, Rumsey averred that he "would like to express his views on various legal issues" but would not do so because of the threat of discipline under the Canons. According to Rumsey, the Canons have actually prevented him from speaking in the past, as evidenced by his response to KJR's questionnaire to that effect.

Hart asserted that he personally solicited signatures for his prior judicial campaigns, but stopped this practice after JEAP issued JE 117, which stated that he would violate the Solicitation Clause by doing so. Hart's position is similar to that of the plaintiff in *Richardson*, in which we held that Richardson established an immediate dilemma in part because the New Mexico statute at issue "caused Congressman Richardson to engage in the activity of fund raising differently than he has in the past." 64 F.3d at 1501. Hart's nomination petition is due in June 2008. Thus he faces a direct and immediate dilemma regarding how he will conduct his campaign.

The Commission argues that plaintiffs' fears of prosecution are illusory. It contends that JEAP's opinions are merely advisory and not binding upon the Commission or the Kansas Supreme Court. Moreover, it claims that it has renounced JEAP's interpretations of the Canons in the "Notes" attached to the relevant opinions. We need not decide the effect of these opinions and notes on Kansas judicial ethics at this stage of our analysis.

10. We note that the Ninth Circuit has dismissed a similar case for lack of ripeness. *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840 (9th Cir.2007). In that case, however, there were no advisory opinions regarding the interpretation of the challenged canon, and no judge had requested one. *Id.* at 849–50. Because the record in the present case is more developed than that in *Feldman*, we conclude that the cases are readily factually distinguishable.

We merely recognize that the existence of these opinions lends credibility to plaintiffs' fears that their speech will violate the Canons; thus their concerns are not merely "imaginary or wholly speculative." *Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301. Having created a system whereby judges and candidates may seek such advisory opinions before taking potentially risky actions, the state should not be surprised when parties rely on such opinions. Although the Notes apparently distance the Commission from the opinions of JEAP, they fall short of an affirmative disavowal of an intention to prosecute. *See id.*; *see also Richardson,* 64 F.3d at 1502.

The Commission also notes that no disciplinary action is pending against judicial candidates. We do not find the lack of disciplinary actions to be dispositive. So long as the Canons remain in effect in their current form, the state is free to initiate such action against candidates. *See Grant v. Meyer,* 828 F.2d 1446, 1449 (10th Cir.1987) (when fear of sanction "is not imaginary or wholly speculative, a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute'" (quoting *Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301)).

▮ With respect to the chilling effect on speech, plaintiffs claim that the Canons are unconstitutionally vague and overbroad. As previously discussed, "the arguable vagueness of a statute greatly militates in favor of finding an otherwise premature controversy to be ripe." *Richardson,* 64 F.3d at 1503. In light of these chilling concerns, we have stated that a plaintiff "should not have to risk prosecution, under a statute whose scope is unclear, before his challenge to the constitutionality of that statute is ripe." *Id.*; *see also Babbitt,* 442 U.S. at 303, 99 S.Ct. 2301 ("If the provision were truly vague, appellees should not be expected to pursue their collective activities at

their peril."). Given that the potential vagueness and overbreadth of the Canons may increase both the hardship to the plaintiffs and the chilling effect on speech, the presence of these claims weighs in favor of ripeness.

▮ Finally, we consider whether the issues are fit for judicial review, focusing on "whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Richardson,* 64 F.3d at 1499. Plaintiffs bring both facial and as applied challenges to the Canons. We have previously held that "a first amendment challenge to the facial validity of a statute is a strictly legal question; it does not involve the application of the statute in a specific factual setting." *ACORN,* 835 F.2d at 740. Accordingly, the facial challenges are fit for review. In addition, we conclude that the as applied challenges are fit, because the facts of this case are relatively uncontested. The Commission's primary objection to plaintiffs' claims is that the Commission and the Kansas Supreme Court have not ruled directly on the *legal* issues at stake.

In conclusion, KJR and the candidates have sufficiently demonstrated a credible, contemporary injury to their First Amendment rights. Delay in review of their claims would not materially assist this court in its legal analysis. Thus these claims are ripe for review.

### C

▮ The Commission claims that we should abstain from hearing this case because the federal constitutional issues at stake could be mooted or presented in a different posture by a determination of state law. *See Pullman Co.,* 312 U.S. at 501, 61 S.Ct. 643. *Pullman* abstention is appropriate when: "(1) an uncertain issue of state law underlies the federal consti-

tutional claim; (2) the state issues are amenable to interpretation and such an interpretation obviates the need for or substantially narrows the scope of the constitutional claim; and (3) an incorrect decision of state law ... would hinder important state law policies." *Lehman v. City of Louisville*, 967 F.2d 1474, 1478 (10th Cir.1992) (citation omitted). Such abstention is "a narrow exception" to the duty of federal courts to adjudicate cases properly before them and "is used only in exceptional circumstances." *S & S Pawn Shop, Inc. v. City of Del City*, 947 F.2d 432, 442 (10th Cir.1991). Courts have been particularly reluctant to abstain in cases involving facial challenges on First Amendment grounds, *see City of Houston v. Hill*, 482 U.S. 451, 467, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987), in part because the delay caused by declining to adjudicate the issues could prolong the chilling effect on speech. *Id.* at 467–68, 107 S.Ct. 2502 (noting that "[t]o force the plaintiff who has commenced a federal action to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect" (quotation omitted)); *see also Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1576 (10th Cir.1995).

▮ Recognizing these problems with *Pullman* abstention, the Supreme Court has expressed a preference for certifying questions to a state's supreme court. Certification "allows a federal court faced with a novel state-law question to put the question directly to the State's highest court," and has the advantages of "reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response" from the state court. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). In addition, the procedure promotes "cooperative judicial federalism," *Lehman Bros. v. Schein*, 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d

215 (1974), particularly in circumstances where a state court "has not yet had the opportunity to interpret the pertinent statutory language," *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir.1988) (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)). The procedure is consistent with our duties to avoid passing on the constitutionality of a statute where possible, *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and, in particular, to avoid considering "the Constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state courts." *Arizonans*, 520 U.S. at 75, 117 S.Ct. 1055 (quoting *Poe v. Ullman*, 367 U.S. 497, 526, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting)).

▮ Yet "[c]ertification is not to be routinely invoked whenever a federal court is presented with an unsettled question of state law." *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988). Absent "some recognized public policy or defined principle guiding the exercise of the jurisdiction conferred," federal courts bear a duty to decide questions of state law when necessary to render a judgment. *Copier ex rel. Lindsey v. Smith & Wesson Corp.*, 138 F.3d 833, 838 (10th Cir.1998) (quoting *Meredith v. City of Winter Haven*, 320 U.S. 228, 234, 64 S.Ct. 7, 88 L.Ed. 9 (1943)). Thus we have held that we will certify only questions of state law that are both "unsettled and dispositive." *Anaconda Minerals Co. v. Stoller Chem. Co.*, 990 F.2d 1175, 1177 (10th Cir.1993) (citation omitted). Moreover, where statutory interpretation is at issue, the touchstone of our certification inquiry is whether the state statute is readily susceptible of an interpretation that "would avoid or substantially modify the federal constitutional challenge to the statute." *Bellotti v.*

*Baird*, 428 U.S. 132, 148, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *see also Am. Booksellers Ass'n, Inc.*, 484 U.S. at 397, 108 S.Ct. 636.

 The decision to certify "rests in the sound discretion of the federal court," *Lehman Bros.*, 416 U.S. at 391, 94 S.Ct. 1741, and a federal court may certify a state-law issue sua sponte. *Elkins v. Moreno*, 435 U.S. 647, 662, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978); *see also* Kan. Stat. Ann. § 60–3202 (permitting certification on the federal court's own motion).[11]

Under our rules, "[w]hen state law permits, this court may . . . certify a question arising under state law to that state's highest court according to that court's rules." 10th Cir. R. 27.1(A). Kansas law provides that

> [t]he Kansas supreme court may answer questions of law certified to it by . . . a court of appeals of the United States . . . if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the court of appeals of this state.

Kan. Stat. Ann. § 60–3201.

 This leads us to conclude that plaintiffs' claims rest on sufficiently novel and determinative questions of state law that certification is warranted. In order to adjudicate plaintiffs' constitutional claims, we must determine the scope and meaning of the three state canons at issue. The Canons are promulgated by the state supreme court to regulate the conduct of state judges and judicial candidates, and thus their interpretation falls squarely within the scope of state law. In addition, we recognize important state policy interests at play in this case. Having chosen to elect their judges, the people of Kansas have an interest in determining how those elections operate. Given that our failure to certify could "prevent the informed evolution of state policy by state tribunals," *Moore v. Sims*, 442 U.S. 415, 430, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), certification under the circumstances is particularly appropriate.

The novelty of the question of the Canons' interpretation is clear. As both parties concede, the Kansas Supreme Court has never ruled directly on the questions presented in this case. In the only Kansas Supreme Court case to address the Canons, the court ruled on the narrow issue of whether a judge's particular conduct violated the Pledges Clause, and the opinion provides no authoritative construction of the terms of the Clause. *See Baker*, 218 Kan. 209, 542 P.2d 701; *see also Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003) (finding certification particularly appropriate when state courts had not been presented with a constitutional challenge to the statute because the federal court "cannot know . . . whether [the state courts] would have concluded that there exists a less natural, but still permissible, reading of the statutes that avoids the

---

11. The Commission requests certification of whether the Pledges and Commits Clauses are de facto announce clauses. *See White*, 536 U.S. at 765, 122 S.Ct. 2528. Because this question is not dispositive in this case, we decline to certify it and likewise hold that the district court did not abuse its discretion in denying the motion to certify. If the Kansas Supreme Court held that these clauses functioned as announce clauses, they would be unconstitutional under *White*. If, however, the Kansas Supreme Court held that the clauses were not announce clauses, we would need to determine how they might otherwise be interpreted under state law. The Commission's failure to ask the right question, however, does not deprive this court of the power to certify dispositive questions to the Kansas Supreme Court. *See Elkins*, 435 U.S. at 662, 98 S.Ct. 1338.

constitutional issues we address here"). As for JEAP's advisory opinions, they are not binding legal precedent and fall far short of constituting settled state law.

A state court ruling on the meaning of the Canons is also likely to moot or substantially modify the constitutional issues at stake. *Bellotti,* 428 U.S. at 148, 96 S.Ct. 2857. Plaintiffs contend that the Canons are facially overbroad, vague, and not narrowly tailored, and that the Canons are unconstitutional as applied to them. The Kansas Supreme Court may determine that plaintiffs' conduct does not fall under the scope of the Canons, thereby negating their as-applied challenges. This possibility is particularly likely in light of the Commission's interpretations of the Canons in the Notes, determining that candidates may answer questionnaires and collect signatures without violating the Canons.

As for the facial challenges, a limiting construction could eliminate any overbreadth or vagueness, as well as support the state's contention that the Canons are narrowly tailored to serve its interests. Like this court, the Kansas Supreme Court has a duty to construe statutes in a constitutional manner, and to save a statute, if possible, rather than strike it down. *State v. Durrant,* 244 Kan. 522, 769 P.2d 1174, 1183 (1989). Although the terms "pledges," "promises," "commits," and "solicits" have clear meanings, each of these terms is modified by a phrase that is susceptible to multiple interpretations.

Under the Pledges Clause, candidates may not make pledges or promises except for those related to "the faithful and impartial performance of the duties of the office." Depending on the breadth of this exception, the Pledges Clause may only prohibit a narrow set of statements. The Kansas Supreme Court is in the best position to define what falls within the scope of the duties of state judicial office and what does not.

■■■ In addition to actual commitments, the Commits Clause prevents candidates from making statements that "appear to commit" them on issues likely to come before the court.[12] Plaintiffs' argument that the Commits Clause is vague rests primarily on the ambiguous meaning of this phrase. As plaintiffs contend, the term could refer either to a subjective or objective appearance of making a commitment. Content-based restrictions on protected speech that depend upon subjective impressions raise serious constitutional questions. *See, e.g., Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content neutral basis for regulation."). An objective test, however, might survive constitutional scrutiny, and a state court ruling on the meaning of this phrase could eliminate unconstitutional vagueness. It is for the Kansas Supreme Court to make such a determination.

■■■ Finally, with respect to the Solicitation Clause, plaintiffs argue that the term "publicly stated support" makes the clause overbroad and not narrowly tailored. Striking down a statute as overbroad is "strong medicine," and we should only do so "as a last resort." *Faustin v. City and County of Denver,* 423 F.3d 1192, 1199 (10th Cir.2005) (quotations omitted).

---

**12.** As the Supreme Court recognized in *White,* limiting the scope of the Commits Clause to issues likely to come before the court "is not much of a limitation at all," 536 U.S. at 772, 122 S.Ct. 2528, because "there is almost no legal or political issue that is unlikely to come before a judge of an American court," *id.* (quoting *Buckley v. Ill. Judicial Inquiry Bd.,* 997 F.2d 224, 229 (7th Cir.1993)). Accordingly, we focus our inquiry on the phrase "appears to commit."

To be overbroad, a law must cover a "substantial amount" of constitutionally protected speech, *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), as "judged in relation to the statute's plainly legitimate sweep," *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). We conclude that the phrase "publicly stated support" is susceptible to a narrowing construction that could preserve the constitutionality of the Clause by reducing the amount of protected speech under its ambit.

We are presented with several novel and unsettled questions of state law, the resolution of which could substantially alter our determination of the federal constitutional issues at stake. Accordingly, we certify the following questions to the Kansas Supreme Court:

1. Does a judicial candidate violate Canon 5A(3)(d)(i) and (ii) by answering a questionnaire asking for his views on disputed legal and political issues?

2. Does a judicial candidate solicit "publicly stated support" in violation of Canon 5C by personally collecting signatures for his nomination petition?

3. Does the definition of "the faithful and impartial performance of the duties of the office" in Canon 5A(3)(d)(i) include all conduct relevant to the candidate's performance in office?

4. Is the definition of "appear to commit" in Canon 5A(3)(d)(ii) limited to an objective appearance of a candidate's intent to commit himself?

5. Does the definition of "publicly stated support" in Canon 5C(2) include endorsements of a candidate?

## III

Both parties concede that the district court's order went beyond the scope of the challenge to Canon 5C(2). Hart claims only that the "publicly stated support" portion of the Solicitation Clause infringes on his First Amendment rights. He does not challenge the remainder of Canon 5C concerning solicitation of campaign contributions. As the Supreme Court has noted, "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). Accordingly, when only one part of a statute is deemed unconstitutional, the appropriate remedy is "to sever its problematic portions while leaving the remainder intact." *Id.* at 329, 126 S.Ct. 961 (citing *United States v. Booker*, 543 U.S. 220, 227–29, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)). Consequently, we limit application of the preliminary injunction to the personal solicitation of publicly stated support.

## V

For the foregoing reasons, we **CERTIFY** questions of state law to the Kansas Supreme Court. We reserve judgment on the preliminary injunction against enforcement of the Pledges and Commits Clauses and the "publicly stated support" portion of the Solicitation Clause pending the response from the Kansas Supreme Court. This panel retains jurisdiction over the appeal. We **VACATE** the preliminary injunction with respect to the campaign contribution aspect of the Solicitation Clause.